ROTHKOPF v. LOWRY & CO., Limited.

No. 226.

Circuit Court of Appeals, Second Circuit.

April 3, 1945.

John E. F. Wood and Root, Clark, Buckner & Ballantine, all of New York City (Arthur A. Ballantine and Philip E. Gregg, both of New York City, of counsel), for appellant.

George Zolotar, of New York City, and Roger S. Foster, Sol., of Philadelphia, Pa. (Ezra Weiss, of Indianapolis, Ind., and Richard V. Bandler, of New York City, of counsel), for Securities and Exchange Commission.

Paul E. Kern, of New York City, for Rothkopf.

Armstrong & Keith, of New York City (Lorenzo D. Armstrong, of New York City, of counsel), for West Indies Sugar Corporation.

Isadore Glauberman, of New York City, for Independent Protective Committee for Holders of Warner Sugar Corporation First and Refunding Mortgage Bonds.

Howie & Robertson, of New York City (William O. Robertson, of New York City, of counsel), for Francis J. Quillinan, as trustee.

Before L. HAND, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

This appeal involves only the meaning of a contract between the appellant, Lowry & Company, Ltd., and the surviving trustee in reorganization, Quillinan, of the debtor, Warner Sugar Corporation. The controversy arose as follows. Three creditors filed a petition against the debtor under Chapter X of the Bankruptcy Act, which the judge approved in July, 1940, and appointed two trustees—Quillinan and another who has died. The debtor was the owner of extensive sugar plantations in Cuba which were subject to a mortgage held in the United States; its operations had been unsuccessful since 1924, and it defaulted on the mortgage on July 1, 1931. After one season (1931–1932) of complete idleness, the bondholders made an operating contract with the Lowry Company, whose president was also the debtor's pres-

518

ident. The first contract was for a single year—1933—and provided that the Lowry Company should manage the properties, finance the debtor, and sell the product, for all of which services it was to be paid out of the net profits of the business. This contract was each year succeeded by others of the same kind: in the first two years—which were during the depth of the depression—the Lowry Company was allowed all the profit; in 1935 and 1936, it was allowed one-half; and thereafter, one third. It was the practice to prepare the contract for the crop of the following year in June, and the contract here in question was for the 1942 crop; and the question is whether the situation so changed, pending its performance, that the Lowry Company did not, and could not, perform, and must therefore be content with a quantum meruit. This issue was raised by a petition filed by one of the original petitioning creditors against the Lowry Company, asking the judge to construe the contract and declare the rights of the parties. The judge held that, because of the changed conditions, arising early in 1942, the contract did not apply to the crop of that year, and that the Lowry Company could not recover under it. The appeal is from that order, the amount of the quantum meruit being left for future liquidation. To an understanding of the contract, and before setting out its relevant provisions, we must state what the situation had been as to the 1941 crop, and how the parties met it.

Beginning in the year 1936 the Cuban Republic had found it necessary to limit the production of sugar, which it did by the promulgation of a "Decree-Law" in that year whose details we need not describe, except to say that it was to last through the year 1941, and that it divided the crop into what could be exported and what could not—"local consumption sugar." The contract for the 1941 crop between the debtor and the Lowry Company, executed on September 30, 1940, required the company to account for what was actually received for "local consumption sugar" and molasses; but, as to export sugar, to account for the current market prices in Cuba at the time of its production. The effect of this was that the Lowry Company underwrote the market price of all export sugar in advance, regardless of what it might eventually receive upon its sale. The harvesting of the crop begins early in the calendar year and ends in the spring; the rest of the year is a dead season when the plantations must be kept up and the machinery repaired and kept in condition; and the contract for the 1941 crop provided—as had the earlier contracts—that the Lowry Company should reserve a fund computed at sixty-five cents a bag to pay for the expenses of this period. The season of 1941 proved worse than those which had gone before, because the war, then at its height, greatly curtailed the market. The crop had been in the neighborhood of two and a half million tons, but the Cuban government wished to limit exports so as to avoid a collapse in price; and to that end it set a stint upon export sugar at two million tons. Since, however, unless more was sold, great numbers of sugar workers and of factories would be thrown out of employment, it also provided for an added quota of 400,-000 tons which it agreed to buy at 1.23 cents a pound, through the "Cuban Sugar Stabilization Institute," a government agency of long standing. The law or decree which so provided was known as "No. 20"; it was passed on March 21, 1941, nearly six months after the contract for the 1941 crop had been executed. Thereupon it became plain that that contract had become no longer possible of complete execution; for the Lowry Company could export only five sixths of the debtor's crop, the balance being commandeered for the purpose just mentioned. For this reason on April 22, 1941, the judge entered an order upon the parties' consent, amending the contract by incorporating at the proper places provisions allowing the Lowry Company to account for sugars "produced in accordance with Cuban Law No. 20" at the prices actually received, just as it accounted for "local consumption sugar" and molasses.

On May 14, the trustees reported to the court the prospective results of the season's operations. The export sugar was 146,007 bags, the "No. 20" sugar, 31,702 bags, the "local consumption sugars," 11,-848. They estimated that the export crop would sell for $749,715.40, which, at 325 pounds to a bag, works out to a price of 1.58 cents a pound. The difference—.35 cents a pound—between this and the price of "No. 20" sugar, when applied to the "No. 20" quota, was about $36,000, and, if there was no profit on the "No. 20" sugar, this involved a loss to the Lowry Company of about $12,600, out of what it would have received—about $66,000—had it been able to dispose of the whole crop at 1.58 cents

a pound, which it almost certainly could not have done. The negotiations for the 1942 contract appear to have started on May 22, about a week after this report was filed. Robertson, the trustee's counsel, sent a copy of the 1941 contract to the Lowry Company's counsel with no significant changes, except four "riders," which all concerned "No. 20." The first of these was not important; the second excluded from those products for which the Lowry Company should account "at prevailing Cuban F. O. B. market prices," not only "local consumption sugars" and molasses, but "such sugars as may be produced in accordance with Cuban Law No. 20 promulgated March 21, 1941, and any amendments thereto or modifications thereof"; the third was in substantially the same words; and the fourth authorized the Lowry Company to comply with "No. 20." These riders did no more than conform the proposed contract for 1942 to the amendments already introduced on April 22 in the 1941 contract by the judge with the parties' consent; except that they added the phrase: "and any amendments thereto and modifications thereof." The Lowry Company's counsel submitted this proposed contract to Upham, its vice-president, who agreed to it with the following suffix (the only change relevant to this controversy), added after the words "modifications thereof": "or any Cuban law or decree of a similar nature." When the Lowry Company's counsel submitted this amendment to Robertson he gave as the reason why Upham wished it, that "No. 20" "probably would not cover 1942 production, but that there might be some decree or law which would take the marketing of the sugar out of the hands of the producers in connection with the 1942 crop." The contract, as so amended, was then signed, and the court approved it.

Our entry into the war in December, 1941, completely revolutionized the Cuban market; the demand for export sugar, which had not been enough to call out the minimum production necessary to keep the industry alive, was then for all that the industry could produce at its utmost capacity. On January 28, 1942, the Defense Supplies Corporation and the Institute made a contract by which the Institute agreed to sell substantially the whole crop to the Supplies Corporation at 2.65 cents a pound, more than double what the Cuban government had paid for its quota of 400,000 tons of the crop in 1941, and an advance of about seventy per cent over what the Lowry Company had been able to get for "export sugar." (The only exceptions were 200,000 tons reserved for local consumption; 65,000 tons for export elsewhere, and quotas already committed to the United States in one form or another.) Since the performance of this contract demanded the delivery of the whole Cuban crop—with the exceptions just noted—and since "No. 20" had commandeered only one-sixth of the 1941 crop and that too for only one year, some new law or decree was necessary: and such a "decree" was passed the same day, and is known as "No. 178." It authorized the Institute to "acquire" the whole crop—including the parts excepted—and to perform the contract with the Supplies Corporation; the excepted parts being left for the Institute to dispose of by "opportune contracts," whose terms were left open. Since it also made it unlawful for producers to sell to anyone but the Institute, in effect it commandeered the crop. Delivery under the contract, so far as concerned risk, ended when the Cuban producer delivered the sugar alongside a vessel in a Cuban port. The Lowry Company maintained, and now maintains, that this law, although not a modification or amendment of "No. 20," was "of a similar nature"; and that it was therefore entitled to recover one third of the profits upon the debtor's sugar sold for export to the Supplies Corporation. Its commission so computed was about $367,000. Its position can be presented most plausibly by saying that the only difference between the two laws was that "No. 20" authorized the commandeering of only a sixth of the export crop at a low price, and that "No. 178" authorized the commandeering of the whole export crop at a high price: in both respects no more than a difference of degree. That is true, and it might be relevant in some connections; but its relevance here depends upon the purposes for which the parties were providing by the amendments in the 1942 contract.

■ At the outset we must remember that the word, "similar," has no inflexible content, but implies a reference to some standard of comparison, itself determined by the context. The negotiations which preceded the contract yield very little evidence of its meaning. Apparently the clause—"of a similar nature"—was added because "No. 20" had been limited to the

1941 crop, and might be followed by another which would also remove part of the 1942 crop from export, and would therefore pro tanto prevent performance by the Lowry Company. We do not forget that its counsel told Robertson that the clause was to cover a law which should "take the marketing of the sugar out of the hands of the producers"; and that it is possible to read this as intended to cover the taking of the whole crop. However, as an interpretative gloss upon the meaning of the words actually used, that testimony was incompetent, for the contract was plainly to be a final memorial of the promises (Restatement of Contracts § 237); and even if that were not true, the words actually interpolated were such that, had their meaning been in fact so broad, others would almost certainly have been selected. When we turn to the underlying purpose of the contract, the result is even plainer. As we have seen, "No. 20" may have cut down the commission of the Lowry Company, although that presupposes that there was no profit in "No. 20" sugar, and that without "No. 20" 1.58 cents a pound could have been realized for the whole export crop. At any rate we may assume that the repetition of the clause implied a willingness to accept the risk of another possible cut, due to another withdrawal from export of part of the crop. But, regardless of any effect it may have had upon the commission, "No. 20" had been passed to reduce the sugar which could be exported, while it gave a subsidy to the industry in order to prevent great distress and possible disorder. This being its general purpose, obviously the subsidy had to be fixed at a price lower than that at which the remainder of the crop—the part to be exported—could be sold abroad; and, as we have seen, that turned out to be the case. Another law, designed like "No. 20" to relieve the continuance of the depression, must also fix a price lower than that expected for exported sugar, else it would tend to suppress exports, precisely the result not desired.

 There is therefore every reason to assume that what the parties were providing for in the clause, "of a similar nature," was a law which should commandeer a part of the crop at a lower price than could be had for the balance abroad, but which would allow the greater part to be privately exported at prices, determined by the higgling of the market. "No. 178" was not in the least "similar" to such a law, judged either in its economic effect upon Cuba, or upon the parties. It did not withdraw a part of the crop from export in order to hold up the export price; it did not in effect grant a subsidy to the industry in order to break the restrictive effect of that withdrawal. No part of the crop was reserved from export—with insignificant exceptions—on the contrary the Supplies Corporation had bid for all of it at a large increase over the 1941 price. "No. 178" was merely ancillary to the performance of that contract: the Institute, having promised to deliver substantially the whole crop, must be put in a position to perform, which meant that the crop must be commandeered. This drastically changed the duties and liabilities of the Lowry Company. The whole export business was taken away from it; there were no current market prices which it need or could guarantee; its function ended upon delivery alongside in Cuba. It is true that it still had services to perform; it must take charge of the debtor's production, finance it, and set apart a fund for the "dead season." But that was not enough. If it was to recover under the contract, it had to perform all the substantial services which were the consideration for the commission. When that became impossible, it was necessarily relegated to a quantum meruit, upon principles of law too well established to justify the citation of authorities.

Order affirmed.