## DEFENSE SUPPLIES CORPORATION v. NORWALK TIRE & RUBBER CO.

District Court, S. D. New York.
June 11, 1945.

Harold E. Jacobson, of New York City, Agency Counsel, Reconstruction Finance Corporation, (Sol A. Liebman, Asst. Agency Counsel, and Henry Fabricant, both of New York City, of counsel), for plaintiff.

Ingram & Schenck, of New York City, for defendant.

BRIGHT, District Judge.

Plaintiff brings this action to recover the balance of the purchase price of automobile tires and tubes sold by it to defendant under a written contract. It is stipulated that tires and tubes of the aggregate value of $609,889.72, as determined by formula D of the contract later referred to, were purchased, that defendant has paid on account thereof $571,979.42, leaving a balance of $37,910.30, against which defendant is entitled to a credit of $7,885.21. For the balance $30,025.09 judgment is sought by plaintiff, with interest at six per cent. from July 9, 1943.

Defendant pleads payment in full as one of its defenses. In that defense it has failed because upon its own figures testified to by its treasurer, and making allowance for a deduction of $4,671.38 for storage, referred to hereafter, there is an unpaid balance of $2,608.49.

Its second defense, which if sustained, it is stipulated shall entitle defendant to a judgment dismissing the complaint, is that prior to the execution of the contract referred to, the Office of Price Administration, as agent of the plaintiff, to induce the contract sued upon, assured defendant that maximum prices for tires and tubes would be adjusted so as to permit it to "cover in full the costs imposed" upon it by the plan mentioned in the contract, such adjustment to be in two steps, a temporary one, and, second, a final adjustment after the final establishment of prices at which plaintiff would resell passenger car tires to members of the plan, of which defendant was one. It is further alleged that these representations were false and fraudulent and were either known by plaintiff so to be, or in making said representations plaintiff intended to convey to defendant the impression that plaintiff had actual knowledge of the matters stated, be influenced thereby, and act in reliance thereon, when plaintiff was at the time conscious that it had no such knowledge, and knew of facts sufficient to cause it to suspect the falsity thereof, and were made without having knowledge whether the same were true or false

and without reasonable grounds to believe them to be true, and with reckless disregard of the injury which might thereby be caused to the defendant, of all of which defendant was in ignorance; that defendant relied thereon, that there was a temporary adjustment as promised, but no final adjustment so as to permit defendant to recover the full costs imposed upon it by the plan.

The counterclaim for damages alleged to have been sustained by defendant because of misrepresentations has been withdrawn.

The impact of the war in Europe caused a shortage of crude rubber in this country, resulting in an allocation plan, among others, for the use of the same in the manufacture of automobile tires and tubes. The restrictions upon use became more stringent as the year 1941 passed. The invasion of Pearl Harbor by the Japanese and the consequent declaration of war, and the elimination entirely from the market of the supply of crude rubber from the East Indies, resulted in a "freezing" by the O.P.A. of all automobile tires and tubes. That created a critical financial situation among jobbers and dealers. They had stocks of tires and tubes which they could not sell and for which they could not pay. The O.P.A. attempted to solve the problem. A plan was finally devised, to be financed by plaintiff, by which the manufacturers, of which defendant was one, and mass distributors like Sears Roebuck and Montgomery Ward, were requested and finally agreed to purchase from the dealers and jobbers all of the passenger tires and tubes held by the latter, the price to be that which had been paid by the dealers and jobbers, plus 10% for their profit and expenses in handling, etc. The tires and tubes so purchased were to be sold by the manufacturers and mass distributors to plaintiff at the price paid to the jobbers and dealers, plus certain charges for handling, storage, etc. As the manufacturer thereafter required tires and tubes for its trade, it could repurchase so much thereof previously sold to the plaintiff at prices to be determined by formula D attached to the contract.

A number of meetings were had between representatives of the O.P.A. and the manufacturers and mass distributors, which defendant attended, and at which the proposed plan was discussed and shaped. The contract in question was prepared by the plaintiff and submitted to those meetings as the contract which it required to be signed by defendant and other manufacturers as the

basis for any financing of the project. None of the representatives of plaintiff attended the meetings mentioned, or made any statements or representations now relied upon by defendant. The O.P.A. had nothing to do with the preparation of the contract, or the terms upon which plaintiff would advance not to exceed $75,000,000 to relieve the situation caused by the freezing of the tires and tubes. The fixing of the maximum sales price was, of course, within the sole jurisdiction of the O.P.A., and plaintiff had nothing to do with that and could not in any way regulate the same.

The contract in question is dated January 28, 1942. It was not actually executed by defendant until February 27, 1942, although copies of it were sent to it on February 11, 1942. When executed, it was returned by defendant to the O.P.A. with a "Letter of Escrow" which stated that the contract was to be turned over to the plaintiff "only when you (the O.P.A.) have received and are prepared to deliver to Defense Supplies Corporation contracts of a like form executed by all members." The members consisted of 56 manufacturers, defendant being one of them, and mass distributors, whose names were attached to the contract.

Prior to the sending of the contract, the Administrator of the Office of Price Administration, on February 9, 1942, had written to the defendant and other manufacturers and mass distributors, a letter outlining the procedure of sale to plaintiff, to repurchase by them, and the price which defendant must pay (which was the price charged plaintiff at the time of the sale to it, plus a percentage calculated according to formula D representing the "proposed share of the cost to the industry of the plan"), and further read as follows:

"In order to protect a Member from loss under the Plan, it will be necessary to permit him to sell to the trade and to consumers any tire or tube that was in his possession at the time of inception of the Plan at a price equal to the present maximum price plus a dollar amount equal to X percent of the car-door cost of such tire or tube. However, any tire or tube that was not in a Member's possession at the inception of the Plan, but was bought back by the Member from dealers, consignees, and jobbers, must have, at one time, been sold downstream by such Member at a markup over and above car-door cost. Presumably, such markup included a profit related to the cost of manufacturing as well as of distributing such tire or tube. As a result of the Plan, this Member will be in a position to sell such tire or tube downstream a second time. However, as an offset to the possible profit benefit accruing as a result of such second sale, manufacturers who are Members under the Plan have agreed to absorb all handling and reconditioning costs incurred on tires that are returned by dealers, consignees, and jobbers. and to limit their charge for inspection and reconditioning on tubes that are returned to a maximum of 5¢ per tube. In general and to the extent that it is possible in an industry-wide ceiling price adjustment, this Office will attempt to guard against permitting any Member from reaping any undue gain, since it is essential that the Plan should not have the effect of placing any Member in an especially advantageous competitive position.

"I assure the participating manufacturers and mass distributors that maximum prices for tires and tubes will be adjusted so as to permit them to cover in full the costs imposed upon them by the Plan. This adjustment will be in two steps. First, a temporary adjustment as of March 16, or on such other date that is set for Members to turn over their own stock, that will be made on the basis of preliminary data submitted on or before March 9 or such other date 9 days following final date set for acceptance of Plan by dealers, consignees and jobbers under the terms of the Plan. Second, a final adjustment that will be made shortly after the final establishment of prices at which Defense Supplies Corporation will resell passenger-car tires to Members."

A temporary advance of 16% in maximum retail prices of new passenger car tires and tubes was authorized by the O.P.A. on or about April 23, 1942. On March 2, 1943, the O.P.A. advised defendant that the Defense Supplies Corporation, on and after January 1, 1943, would reduce from 4% to 2% interest charges on the repurchase value of dealer and jobber tires and tubes repurchased by defendant, and would absorb charges accruing subsequent to that date for storage space newly acquired by defendant necessary for the storage of tires and tubes returned by dealers and jobbers. It further read: "We should like to point out that this adjustment does not cover the factory and field stocks of Members, since it was the intent of the

Plan that Members bear the storage and financing charges on their own stocks. Other inequities which have arisen in connection with the Plan have already been taken care of through the Tire and Tube Adjustment Contract and this adjustment, covering interest and storage charges on dealer and jobber stocks, must be considered as a final adjustment of all problems relating to the Tire Return Plan."

The claim of defendant is that this was definite notice that no final adjustment of prices would be made as promised by the O.P.A. on February 9, 1942, and was a distinct repudiation of the representations then made and definite proof of fraud.

It is noted, however, that the O.P.A. stated that, because of the reduction of the interest charge, the assumption of storage expense, and the taking care of other inequities in connection with the plan, the information communicated must be considered "as a final adjustment" of all problems.

The first question is whether or not the Office of Price Administration was the agent of the plaintiff in the making of any representations relied upon by the defendant.

The Reconstruction Finance Corporation was created a body corporate on January 22, 1932, 15 U.S.C.A. § 601. Its entire capital stock is owned by the United States. It was authorized by Section 606b(3), in order to enable the government in its national defense program, to create a corporation to acquire, carry, sell or otherwise deal in strategic or otherwise critical materials as defined by the President; and the powers of any such corporation were to be set out in a charter, filed with the Secretary of the Senate and the Clerk of the House of Representatives. Admittedly plaintiff was so created and exists, and all of its capital stock is owned by the Reconstruction Finance Corporation.

■ The Office of Price Administrator is also a government agency, created originally under the name of Office of Price Administrator and Civilian Supply by executive order of the President, and later under the Emergency Price Control Act of 1942, 50 U.S.C.A. Appendix, § 901 et seq. As such, it was authorized to utilize the services and facilities of other federal departments and agencies to the fullest extent compatible with efficiency. But neither under the executive order nor under the Emergency Price Control Act was it constituted an agent of the plaintiff. It was authorized to advise and make recommendations in respect to the purchase and acquisition of commodities, to formulate programs for the use of consumers' goods, fix maximum prices, and buy and sell commodities under certain conditions. But the Federal Loan Administrator was the one who should define what was a strategic or critical material, and such commodity could be bought and sold, stored or used, and payments made therefor, only by corporations organized and created under the Reconstruction Finance Corporation Act, subject only to the fixing by the O.P.A. of maximum prices.

■ It is admitted by defendant that it is not able to show any representation or statement by plaintiff, in so far as we are interested, with reference to the contract in question, or upon which defendant relied in executing it. It needs no citation to show that statements made by an alleged agent would not prove agency. And in that connection, it is admitted that no representative of the O.P.A. claimed that he was acting as agent for the plaintiff. And the recitals in the contract itself, which was executed by plaintiff and defendant, and not in any way prepared by the O.P.A., do not recite anything which in any way establishes such agency. It does show that the O.P.A. had requested plaintiff to make the agreement for the purpose of carrying out the desire of the O.P.A. to conserve tires and tubes and to promote the purposes of the regulations issued by it, and that plaintiff was agreeable to purchase tires and tubes not to exceed in the aggregate $75,000,000. Further than that, there is no intimation that plaintiff requested the O.P.A. to act for it in the transaction, and the proof fails to show that it did. In fact, all the testimony shows is that plaintiff acted as a banker in financing the transaction to relieve as far as possible the serious difficulties in which dealers and jobbers found themselves as a result of the freeze order.

■ The contract itself is devoid of any statements which lend any weight to whatever was said or represented on the subject of price by any representative of the O.P.A. Aside from the question of fraud, the contract is presumed to have merged into it all negotiations and transactions prior thereto. It might be said in passing, that promissory statements are never the basis for a finding of fraud unless it clearly appears that when made they

never were intended to be met or carried out.

█ Even assuming such agency, there is no evidence of a fraudulent statement by the O.P.A. in its letter of February 9, 1942, or otherwise. The assurance was that prices would be adjusted to cover in full the costs imposed upon them by the plan, first, temporarily, and second, shortly after final establishment of prices at which plaintiff will resell. On April 23, 1942, the temporary adjustment was made. On March 2, 1943, the prices were further adjusted by a reduction in interest charges, and the absorption by plaintiff of charges accruing subsequent to January 1, 1943, for storage space newly acquired and necessary for storage of tires and tubes returned by dealers and jobbers. Other inequities had previously been taken care of. It was definitely stated that these adjustments were the final ones. Thus the promise was carried out. That it was not satisfactory to defendant does not prove fraud or misrepresentation. In addition, it may be pointed out that these promises, if they may be said to include the construction sought to be placed upon them by defendant, are not shown to have been made with any intention of not performing them, or recklessly. Aside from that, they were preliminary to the written contract which may properly be said "plainly to be a final memorial of the promises." Rothkopf v. Lowry & Co., 2 Cir., 148 F.2d 517-520.

The remaining question is whether or not the defendant is entitled to a credit of $4,-671.38 for expenses incurred by it for storage space for tires and tubes manufactured by it and never sold to dealers or distributors.

The defendant's contention with reference to this subject is based upon section 5 of the contract, which, so far as material, reads:

"5. Member will store in the usual and proper manner to prevent undue depreciation all tires and tubes purchased from it by Defense Corporation under the provisions hereof at no expense to Defense Corporation except actual rental paid by member for any new storage space which it is necessary to procure from others for the storage of said tires and tubes. Member will if and so long as it has storage space available belonging to it or which it now leases, supply space for said tires and tubes at no expense to Defense Corporation. Tires and tubes stored by member for Defense Corporation will be segregated and kept separate and apart from merchandise owned by member and signs will be placed on or in said storage space, properly identifying said stocks as being the property of Defense Corporation and bearing the legend 'Property of Defense Supplies Corporation, Washington, D. C.' Member will be liable for losses of tires and tubes stored by it for Defense Corporation only when caused by the negligence of member, such liability being limited to Defense Corporation's investment in the merchandise lost through such negligence."

The contract also provides in paragraph 6 that the plaintiff will sell to the defendant all or any portion of the tires and tubes purchased from the defendant by the plaintiff at prices to be determined by formula D attached to the contract. That formula specified that the price should equal the sum of the car-door cost (which generally is the cost of the tire or tube to the manufacturer when placed in a car for shipment), plus a number of other items, among which was included financing expense by plaintiff, which was interest at 4% per annum, figured on the price for the period between the date when the Defense Corporation paid for the tires and tubes and the date when the defendant made funds available to the plaintiff for their repurchase, plus "a proper pro rata share of storage paid by Defense Corporation to member and other members."

It is shown without dispute that before this contract was made, defendant had no storage space under lease or otherwise than on its own premises. It manufactured tires and tubes only when ordered by purchasers thereof; and between the time they were completed and their shipment, they were stored by the defendant on the floor where its shipping room was located, and usually occupied about 40% to 50% of the 10,000 square feet of space of which that floor consisted. The remaining space was occupied by the shipping department, which used about one-fourth of the 10,000 feet, about 1,000 feet by vats, and another one-fourth by the finishing and inspecting department of the defendant. When the contract was entered into defendant had in the storeroom mentioned about 7,000 tires (referred to as "frozen"), which occupied a space that would be necessary for the normal flow of the defendant's product coming through the plant at that time. Unless these frozen tires were moved, defendant would not be able to function freely because of the

continuing process of finishing, inspecting and getting other tires ready for shipment. When defendant was confronted with this situation, this frozen stock of tires was shipped to a Bridgeport warehouse and storage paid on the same. It is for these 7,000 tires, which were clearly factory stock, and which had never been delivered to any distributor or jobber, or repurchased from such distributor or jobber by the defendant, upon which storage to the extent of $4,671.38 is now sought by the defendant to be offset against plaintiff's claim.

Plaintiff opposes any such credit, alleging that the true construction of the contract was that it was not to reimburse for any storage except that paid by defendant for extra space required in which to store tires and tubes bought by it from dealers and distributors.

The contract, paragraph 5, requires a member to store all tires and tubes purchased from it by the Defense Corporation at no expense to the latter, except actual rental paid by the member, for any new storage space which it is necessary to procure from others for the storage of said tires and tubes, and the member agrees that, if and so long as it has storage space available which then belonged to it, and which it then leased, it would supply space for said tires and tubes at no expense to the plaintiff.

Concededly, the Defense Corporation has paid to defendant all amounts paid by defendant for the storage of tires and tubes received by it from distributors and dealers. The only tires upon which the plaintiff has not paid storage are the tires which the defendant had in its possession at the time of the signing of the contract, and which, under the definitions contained in the contract, were "factory stocks", i.e., tires and tubes stored in the factory and elsewhere in the same town or city in which the factory is located, and which have not entered into the stream of distribution.

Factory stock tires were agreed to be sold by defendant under paragraph 4(2) of the contract, at prices determined by formula "C". That formula does not include any charge for storage on factory stocks. In fact, it excludes any such charge by expressly providing that storage is to be added only to the price of "field stocks". Such factory stock tires were to be sold by plaintiff to defendant at prices to be determined by formula D (contract paragraph 6). That formula paragraph 5(b) includes as one of the elements of price "a proper pro-rata share of storage paid by Defense Corporation to member and other members".

This certainly would not seem to contemplate any charge for storage on factory stocks because the Defense Corporation did not contract to pay any such charge to a member.

The contract, as I have written, was signed by defendant on February 27, 1942. On March 2, 1942, defendant was advised that under regulations adopted by plaintiff, covering warehousing and storage of tires and tubes under the plan, "no storage space shall be acquired and charged to 'pool cost' (which comprises the total elements of cost incident to the purchase of all tires and tubes by plaintiff from defendant and other members) for storage of field or factory stocks of members."

Defendant questioned this regulation in a letter of March 10, 1942, and requested to be advised. By telegram, he was advised that the agreement contemplates that plaintiff would pay only for additional storage of tires and tubes reacquired by members from dealers and jobbers, and which storage was to be charged pro-rata to all members under paragraph 5 of the agreement and paragraph 5 of formula D.

Again, on June 10, 1942, special attention was called to paragraph 5 of the agreement relating to storage. That notice required that invoices covering storage should be certified as representing "newly acquired storage for dealers and jobber stocks of tires and tubes repurchased under the plan". The limitation of storage charges to tires and tubes repurchased from dealers and jobbers was emphasized again on June 30, 1942.

It is clear, I think, that there is, in the contract, a distinct differentiation between factory stocks, field stocks, and stocks purchased by members from dealers and distributors. Storage on the last two classes is specifically mentioned, and was paid for the third. There is no such provision for the first. The probable reason for that was, that when tires and tubes were frozen, manufacturers would have on hand certain factory stocks which they had in storage and which, under the circumstances, they would be required to hold until purchased by plaintiff, repurchased by defendant, and sold to dealers and distributors under the plan. Storage of such was the manufacturer's problem and no charge therefor

was assumed by plaintiff or included in the pool cost in formula D. The distinction, I think, appears in the contract, and is carried through in all of the correspondence.

Under the stipulation, therefore, judgment will be directed for plaintiff, in the sum of $30,025.09 with interest from July 9, 1943.

Findings may be proposed by plaintiff within ten days from this date and a copy served on defendant's attorneys, who may have five days in which to file objections. The court will then make the formal findings and file the same as required by Federal Rules of Civil Procedure, Rule 52, 28 U.S.C.A. following section 723c.